**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PETER SCHNEIDER, | ) | CASE NO. 1:16CV2502 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Peter Schneider ("Plaintiff" or "Schneider"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his applications for Period of Disability ("POD") and Disability Insurance Benefits

("DIB"), under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation. For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

In June 2007, Schneider filed applications for POD and DIB, alleging a disability onset

date of May 3, 2003 and claiming he was disabled due to bipolar disorder type 2, depression,

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

fibromyalgia, and low testosterone. (Transcript ("Tr.") 82, 99, 663.) The applications were

denied initially and upon reconsideration, and Schneider requested a hearing before an

administrative law judge ("ALJ"). (Tr. 63-65, 70-72.)

On March 2, 2010, an ALJ held a hearing, during which Schneider, represented by

counsel, and an impartial vocational expert ("VE") testified. (Tr. 26-56.) On July 27, 2010, the

ALJ issued a written decision finding Schneider was not disabled. (Tr. 663-672.) The ALJ's

decision became final on July 27, 2011, when the Appeals Council declined further review. (Tr.

1-3.)

Schneider appealed the decision to this Court in September 2011. *See Schneider v.

Comm'r of Soc. Sec.*, Case No. 1:11cv2017 (N.D. Ohio) (Baughman, M.J.) On February 12,

2013, Magistrate Judge William Baughman issued a Memorandum Opinion & Order reversing

the July 2010 ALJ decision in part and remanding for further proceedings consistent with his

Opinion. (*Id.* at Doc. No. 29.) Of particular relevance herein, Judge Baughman ordered as

follows:

> There is a problem, however, with respect to the mental limitations in the RFC.
> The ALJ gave great weight to the opinion of Dr. Lewis, the state agency
> reviewing psychologist. Dr. Lewis found that Schneider had moderate
> limitations in concentration, persistence, and pace. Based thereon, she limited
> Schneider to superficial work at a job without strict time pressure and
> production quotas. The ALJ, however, did not place the limitation on strict
> time pressures or production quotas in the RFC.
>
> According to the Sixth Circuit's opinion in *Ealy v. Commissioner of Social
> Security*, whenever an ALJ finds a claimant moderately limited in
> concentration, persistence, and pace, with specific pace-based limitations
> indicated, it is error for the ALJ not to include those limitations in the RFC
> finding. Because the ALJ gave the state reviewing psychologist great weight;
> and her opinion included pace-based limitations to compensate for moderate
> impairment in concentration, persistence, and pace; under *Ealy* and its progeny,
> these limitations should have been included in the RFC finding and the

2

hypothetical to the VE. They were not.

\* \* \*

Since the challenge to the hypothetical to the VE follows the challenge to the RFC, if the RFC was defective, then so was the hypothetical. This case must be remanded for a reconsideration of the mental limitations incorporated into the RFC.

(*Id.* at Doc. No. 29 at pp. 5-6.)(footnotes omitted).

Upon remand, the Appeals Council assigned Schneider's case to the same ALJ that issued the first decision and ordered the ALJ to "address the additional evidence submitted, take any further action needed to complete the administrative record, and issue a new decision." (Tr. 651.) On April 23, 2015, the ALJ held a hearing, during which Schneider, represented by counsel, and an impartial VE testified. (Tr. 593-630.) Thereafter, on November 4, 2015, the ALJ issued a written decision finding Schneider was not disabled from May 2003 through his date last insured of December 31, 2008. (Tr. 573-584.) The ALJ's decision became final on September 9, 2016, when the Appeals Council declined further review. (Tr. 564-569.)

On October 13, 2016, Schneider filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 12, 14.) Schneider asserts the following assignment of error:

> (1)     The Administrative Law Judge failed to properly assess the Plaintiff's Mental Residual Functional Capacity on Remand despite clear instructions from the Federal Court.

(Doc. No. 12.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Schneider was born in April 1959 and was forty-nine years-old at the time of his date last

insured, making him a "younger" person under social security regulations. (Tr. 583.) *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c). He has at least a high school education and is able to communicate in English. (Tr. 583.) He has past relevant work as a cashier (light, SVP 2) and retail clerk (light, SVP 3). (*Id.*)

**B.    Relevant Medical Evidence**[2]

Schneider began mental health treatment at the Center for Families and Children ("CFC") on September 5, 2003. (Tr. 273.) He reported restlessness, fatigue, concentration difficulties, irritability, and "irrational anxiety." (*Id.*) Schneider claimed he was unable to work due to his symptoms. (*Id.*)

On March 9, 2004, Schneider presented to rheumatologist David E. Blumenthal, M.D., for evaluation of "diffuse arthralgias, myalgias, and fatigue." (Tr. 291.) Dr. Blumenthal noted Schneider's fibromyalgia risk factors included "stress, hx of depression since mid-20's, family hx of depression or bipolar disorder in father (died of suicide), brother, and maternal grandmother, lack of exercise, and traumatic life experiences." (*Id.*) On examination, he noted a slightly depressed affect and multiple fibromyalgia tender points. (*Id.*) Dr. Blumenthal found Schneider's presentation was consistent with fibromyalgia "caused by underlying anxiety and depression." (*Id.*)

On April 6, 2004, Schneider underwent an Initial Psychiatric Evaluation at the CFC with Syed Ahmed, M.D. (Tr. 354-355.) He complained of anxiety and depression, and described his symptoms as including nervousness, constant worrying, feeling on edge, erratic sleep, crying

_____

[2] As Schneider's sole assignment of error relates to the mental limitations in the RFC, the Court will limit its recitation of the evidence to that relating to his mental impairments.

episodes, decreased interest, decreased concentration, "occasional death wish since last summer," low self-esteem, and lack of self-confidence. (Tr. 354.) Schneider reported a history of major depressive disorder and stated that, although he had suicidal thoughts, he had never attempted suicide. (*Id*.) On mental status examination, Dr. Ahmed noted the following:

> Clean, casually dressed, awake, alert and oriented to time, place and person, pleasant. Patient makes good eye contact and good rapport was established. His speech is normal in rate, rhythm and volume. His affect is reactive and his behavior is appropriate. His mood is depressed, but no suicidal or homicidal ideation. He is over-inclusive in giving his history and had some circumstantiality. He had no evidence of auditory or visual hallucinations or delusions. He has fair to good insight and judgment.

(Tr. 355.) Dr. Ahmed diagnosed major depressive disorder, severe without psychotic features; and assessed a Global Assessment of Functioning[3] ("GAF") of 45, indicating serious symptoms. (*Id*.) He prescribed Remeron and advised Schneider to follow up with his case manager. (*Id*.)

Schneider returned to Dr. Ahmed on nine (9) occasions in 2004. (Tr. 263-271.) In June 2004, Schneider reported "feeling a lot better" with "80 - 90% improvement." (Tr. 271.) Dr. Ahmed noted good eye contact; polite, pleasant, and cooperative behavior; euthymic mood; and good insight and judgment. (*Id*.) In July 2004, Schneider stated "my mental health is getting better and better" and "I don't have the irritability anymore." (Tr. 269.) Dr. Ahmed noted good eye contact, pleasant and cooperative behavior, normal speech, appropriate affect, euthymic

---

[3] The GAF scale reports a clinician's assessment of an individual's overall level of functioning. An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

mood, and good insight and judgment. (*Id*.) In August 2004, Schneider stated he was doing "better than I have done in a long while." (Tr. 268.) He denied any "bad thoughts," stated his fibromyalgia was improving, and reported he was "sleeping and eating well." (*Id*.) Schneider also denied any medication side effects. (*Id*.) Later that month, Schneider reported difficulty sleeping but denied feeling depressed. (Tr. 267.) On examination, Dr. Ahmed noted good eye contact, pleasant and cooperative behavior, mildly anxious mood, and normal speech. (*Id*.) He added a diagnosis of insomnia. (*Id*.)

In September 2004, Schneider reported "doing better" and "sleeping and eating well." (Tr. 266.) Dr. Ahmed noted Schneider was "preoccupied with [his] fibromyalgia," but mental status examination findings were otherwise normal. (*Id*.) Later that month, Schneider stated he was "doing very well 'consistently.'" (Tr. 265.) Dr. Ahmed noted Schneider was pleasant and cheerful with normal speech and euthymic mood. (*Id*.) In October 2004, Schneider was doing well with "no problems sleeping and eating well." (Tr. 264.) He continued to have some somatic complaints but was feeling "a lot better." (*Id*.) On examination, Dr. Ahmed noted Schneider was circumstantial and overinclusive, but all other findings were normal. (*Id*.) In December 2004, Schneider was "sleeping and eating well" with "no agitation episodes" or feelings of depression. (Tr. 263.) Schneider stated he was "hoping to find employment soon." (*Id*.)

Schneider returned to Dr. Ahmed on ten (10) occasions in 2005. (Tr. 247-262.) In January 2005, Schneider was "doing very well" and "starting a two week job tomorrow." (Tr. 262.) He denied any medication side effects. (*Id*.) In February 2005, Schneider was doing well and denied feeling depressed. (Tr. 261.) During both these visits, Dr. Ahmed noted good eye

contact, pleasant and cooperative behavior, normal speech, euthymic mood, and good insight and judgment. (Tr. 261-262.) In March 2005, Schneider was anxious but denied any "intolerable anxiety" and reported sleeping and eating well. (Tr. 260.) Schneider reported doing well in April and June 2005, and Dr. Ahmed continued to note good eye contact, pleasant and polite behavior, appropriate affect, normal speech, euthymic mood, and good insight and judgment. (Tr. 258, 259.)

In August 2005, Schneider reported receiving treatment for abdominal pain, including a colonoscopy. (Tr. 256.) However, he stated he was feeling "very well mentally" with no depression or irritability. (*Id*.) Schneider also stated he could control his anger "a lot better" and had been working on and off on temporary jobs. (*Id*.) He again denied any medication side effects. (Tr. 255, 256.) In September 2005, Schneider reported a history of irritability and "road rage while driving but denied any shouting or screaming." (Tr. 253.) He felt well otherwise and mental status examination findings were normal. (Tr. 253-254.) In October 2005, Schneider reported he had been diagnosed with a gastric ulcer and was scheduled for a cholecystectomy later that month. (Tr. 251.) He denied feeling depressed and reported increased stamina and an ability to "get more done." (*Id*.) Schneider also stated he was sleeping and eating well, and denied any medication side effects. (*Id*.) Later that month, Schneider stated "overall I am doing pretty good" and denied any further episodes of road rage. (Tr. 249.) In December 2005, Schneider denied any depression or "undue anxiety," although he continued to have problems with fibromyalgia and chronic fatigue. (Tr. 247.) On examination, Dr. Ahmed noted good eye contact, fair hygiene and grooming, polite and pleasant behavior, normal speech, euthymic mood, and good insight and judgment. (*Id*.)

Schneider continued to present to Dr. Ahmed regularly in 2006, seeing him on eight (8) occasions. (Tr. 237-246, 370-375.) In February 2006, Schneider stated he was "doing a lot better," had more energy, and denied any depression. (Tr. 245.) On examination, Dr. Ahmed found Schneider had fair hygiene and grooming, good eye contact, normal speech, appropriate behavior, "mildly anxious affect as at baseline," euthymic mood, good insight and judgment, and somatic preoccupation. (*Id.*) The following month, Schneider was "feel[ing] okay mentally" with no depression or excessive anger. (Tr. 243.) In April 2006, Schneider was "doing very well," denied any problems, and stated "this is the best I have done over the last 25 years." (Tr. 241.) On examination, Schneider had a mildly anxious affect and was "somewhat preoccupied with physical health" but was otherwise normal.[4] (*Id.*) In June 2006, Schneider complained of continued abdominal pain, but denied any depression or medication side effects. (Tr. 238.) Mental status examination findings were normal. (*Id.*) In July 2006, Schneider stated that "I seem to be doing very well mentally and emotionally." (Tr. 237.) Dr. Ahmed described his psychiatric condition as being "in remission." (*Id.*)

On September 7, 2006, Dr. Ahmed completed a Daily Activities Questionnaire regarding Schneider's mental functioning. (Tr. 462-464.) Dr. Ahmed stated Schneider was oriented to time, place and person, and had good hygiene and grooming, normal speech, euthymic mood, appropriate affect, some irritability and nervousness, and fair to good insight and judgment. (Tr. 462.) He found Schneider had good concentration, fair long and short term memory, and fair

---

[4] The record also reflects that, on April 19, 2006, Schneider reported to Dr. Blumenthal as follows: "Today the patient reports that he was referred to a psychiatrist and put on Remeron. With this medication his mood improved, his energy gradually returned and his pain diminished. Today he says that the fibromyalgia is 'manageable' and he is planning to return to work." (Tr. 305.)

8

abstract reasoning. (*Id.*) Dr. Ahmed indicated a diagnosis of major depressive disorder since 1991. (Tr. 463.) He concluded Schneider had a (1) fair ability to remember, understand, and follow directions; (2) fair ability to maintain attention; and (3) limited ability to sustain concentration, persist at tasks, and complete them in a timely fashion. (*Id.*) Dr. Ahmed noted Schneider was "not comfortable in large gatherings" and noted that "under stress, the patient may relapse." (*Id.*)

Schneider's case manager, Christina Finn, CPST, completed a Daily Activities Questionnaire on September 13, 2006. (Tr. 460-461.) Ms. Finn stated Schneider reported no problems getting along with coworkers or supervisors, stating he "generally gets along well with everyone." (Tr. 460.) When asked to provide examples "of anything that might prevent work activities for a usual work day or work week," she indicated as follows: "Not being punctual for work, poor stress tolerance and dealing with the public. High need for rest which resulted in low energy, poor motivation." (*Id.*) Ms. Finn indicated Schneider had no problems with food preparation and personal hygiene, but stated his fibromyalgia made it difficult for him to go shopping and do household chores. (Tr. 461.) She also found Schneider had problems driving and/or taking public transportation when stressed and irritated but noted he was "getting better." (*Id.*) Finally, Ms. Finn reported Schneider was compliant with his medications, always punctual to appointments, and did not exhibit any behavior issues during treatment. (*Id.*)

On October 19, 2006, Schneider reported his depression was under control. (Tr. 372.) He indicated his mother wanted him to work but he felt "overwhelmed with the process of finding a job and interviewing." (*Id.*) Mental status examination findings were normal, with the exception that he was "overtalkative." (*Id.*) In December 2006, Schneider reported more energy

and stamina.  (Tr. 370.)  Examination findings were again normal.  (*Id.*)

In January 2007, Schneider began treatment with psychiatrist Aurora Ventenilla, M.D. (Tr. 368-369.)  He reported a history of depression and a variety of symptoms including periods of decreased energy, irritability, racing thoughts, outbursts of anger, and periods of "not being able to function."  (Tr. 368.)  On examination, Dr. Ventenilla noted full affect, pleasant mood, restlessness, and good insight/judgment.  (Tr. 369.)  She diagnosed bipolar disorder type II, and continued Schneider on Remeron.  (*Id.*)

In March 2007, Schneider reported racing thoughts and hyperactivity.  (Tr. 367.)  He was not aware of mood swings, but Dr. Ventenilla noted his affect was increased, his mood was hypomanic, and his speech was clear but fast.  (*Id.*)  She continued Schneider on Remeron, and added a prescription for Lamictal.  (*Id.*)  In April 2007, Schneider was "slightly anxious and slightly hypomanic," but reported he was feeling "a lot better."  (Tr. 366.)  He indicated no sleeping difficulties or outbursts of temper, and "not too much racing thoughts."  (*Id.*)  Dr. Ventenilla indicated "no side effects as such" and continued Schneider on his medications. (*Id.*)

In May 2007, Dr. Ventenilla noted improvement as follows:

> Neat, good hygiene.  Speech clear, good rate, normal volume.  Affect good range.  Mood euthymic.  No psychotic symptoms – no suicidal ideation. Judgment and insight good.  Patient reported feeling much better since on Lamictal.  "I should have been on this med a long time ago."  His temper is much controlled.  Not as irritable. Sleeps good.  Mind not racing anymore, but still having problem sleeping early because he programmed himself for years. He is a night person.

(Tr. 365.)  Dr. Ventenilla noted Schneider's bipolar was improving, and continued him on Lamictal and Remeron.  (*Id.*)

The following month, however, Schneider reported breakthrough outbursts of temper

with his mother.  (Tr. 364.)  He felt "somewhat better with Lamictal but [it had] not completely

abolished the mood swings and irritability."  (*Id*.)  His speech was rapid and non-stop, but he

showed no flight of ideas.  (*Id*.)  Dr. Ventenilla increased his Lamictal dosage, and stated she

would consider decreasing the Remeron dosage if he continued to be hypomanic.  (*Id.*)

Meanwhile, Schneider was referred to Vocational Guidance Services for work evaluation

during the weeks of May 29, 2007 to June 1, 2007 and July 9, 2007 to July 13, 2007.  (Tr. 324-

344.)  The evaluator noted as follows:

> Mr. Schneider was on time and present each day during the work evaluation.
> He was able to follow all directions without additional explanations.  He was
> cooperative and interacted appropriately with staff and peers.  His grooming
> and hygiene were good.  He reported no undue pain or fatigue in connection
> with the work evaluation.

(Tr. 329, 339.)  In the Performance Summary section of the evaluation, the evaluator noted

Schneider had "excellent learning aptitudes and functional skills,"  "is showing all work-ready

behaviors," and "is job-ready at this time."  (Tr. 340-341.)  The evaluator concluded as follows:

> Mr. Schneider is ready for competitive employment.  His work behaviors and
> learning abilities are excellent.  He does have some physical limitations and
> would need a job with no heavy lifting or repetitive lifting.  He needs a job
> that does not have a rapid work pace, as his fibromyalgia can cause fatigue.

(Tr. 341.)  The evaluator remarked that Schneider "may wish to begin by working part-time to

preserve his benefits and to assess his physical stamina.  He was able to tolerate the 5-hour day

in work evaluation with no undue pain or fatigue . . .[but] did report some stiffness after sitting

for an hour or two."  (Tr. 343.)

Schneider returned to Dr. Ventenilla on August 2, 2007.  (Tr. 363.)  He reported

increased outbursts of temper, racing thoughts, and fibromyalgia pain.  (*Id.*)  On examination,

Dr. Ventenilla noted full affect, elated mood, fast and pressured speech, and good judgment and

insight. (*Id.*) She added Lyrica for his fibromyalgia symptoms and adjusted his psychiatric medications, increasing his Lamictal and decreasing his Remeron dosages. (*Id.*) Later that month, Schneider reported the medication adjustments reduced his racing thoughts and decreased his irritability and impatience. (Tr. 362.) He stated he was feeling "much better" and Dr. Ventenilla noted euthymic mood, broad affect, and clear and goal directed speech that was less pressured and at a slower rate. (*Id.*) She continued him on his medications. (*Id.*)

On August 30, 2007, Dr. Ventenilla completed a Medical Source Statement regarding Schneider's Mental Capacity. (Tr. 380-381.) Dr. Ventenilla found Schneider had a "fair" ability[5] to understand, remember and carry out simple job instructions, maintain appearance and manage funds/schedules. (*Id.*) In all other categories listed on the form, however, she determined Schneider had "poor to no" ability, including with respect to his abilities to follow work rules, use judgment, maintain attention and concentration for extended periods of two hour segments, maintain regular attendance and be punctual, deal with the public, relate to coworkers, interact with supervisors, deal with work stress, and complete a normal workday or workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*)

On August 31, 2007, Schneider's case manager Ms. Finn completed another Daily Activities Questionnaire. (Tr. 358-360.) Ms. Finn noted Schneider never had any problems with former employers, supervisors or co-workers, but stated he had a history of problems with

---

[5] The form defined "fair" ability as follows: " Ability to function in this area is seriously limited but not precluded. May need special consideration and attention." (Tr. 380.) "Poor to none" is defined as "no useful ability to function in a competitive setting. May be able to perform in a sheltered setting." (*Id.*)

punctuality.  (Tr. 358.)  When asked to provide examples "of anything that might prevent work activities for a usual work day or work week," she recorded Schneider's response as follows: "Drowsiness – the medications make me tired, I yawn a lot . . .punctuality is a problem.  Anxiety has been a problem at work . . .. Forgetfulness, poor concentration."  (*Id.*)  Ms. Finn concluded as follows:

> Mr. Schneider becomes overly preoccupied with all his health concerns which can interfere with employment.  He takes his health seriously and attends all appointments.  He strives to be well but has side effects that can become bothersome.  He can become overly anxious when overwhelmed with tasks to complete.

(Tr. 360.)

In September 2007, Schneider reported he was "completely off the Remeron and has no return of depression or much racing thoughts."  (Tr. 167.)  Dr. Ventenilla noted his speech was fast but logical and goal-directed, and he showed good insight and judgment.  (*Id*.)  In November 2007, Schneider stated the medication had been helping.  (Tr. 166.)  He reported less outbursts of temper and racing thoughts, and denied any bouts of depression.  (*Id*.)

On November 2, 2007, during an appointment with gastroenterologist Kola Hisamuddin, M.D., Schneider reported Lamictal was "controlling his psychiatric symptoms well."  (Tr. 439.)

Schneider underwent another vocational evaluation with Vocational Guidance Services from November 12, 2007 to December 7, 2007.  (Tr. 406-411.)  An Occupational Skills Training Report rated Schneider as "outstanding" in the categories of attendance, punctuality, on-task behavior, accepting authority, interaction with staff and peers, and cooperation.  (Tr. 408-409.) He was rated "adequate for competitive setting" in all other areas, including productivity, work quality, work appropriate appearance, learns new tasks, follows verbal and written instructions,

retains instructions, sustains concentration, decisiveness, problem solving, improves productivity with repetition, frustration tolerance, energy level, stress management, communication skills, shows initiative, motivation to work, independence, and confidence. (*Id.*) The evaluator noted Schneider had shown improvement in attendance and punctuality, retaining instructions, confidence, and stress management/frustration tolerance. (*Id.*) It was recommended Schneider "continue with an additional 4-week period to begin as of Monday, December 10, 2007, in order for [him] to obtain additional software knowledge and to continue to increase keyboarding/data entry speed to become more marketable in the job market." (Tr. 411.)

Schneider returned to Dr. Ventenilla on December 19, 2007. (Tr. 165.) He was sad because his brother's cancer had returned. (*Id.*) Mental status examination findings were normal, but Dr. Ventenilla increased Schneider's Lamictal dosage. (*Id.*)

The record reflects Schneider presented to Dr. Ventenilla on eleven (11) occasions in 2008. (Tr. 163-164, 427-429, 453-458.) In January 2008, Schneider was depressed due to his brother and mother's poor health. (Tr. 164.) He had started a trial of Klonopin, and reported feeling sleepy and dizzy. (*Id*.) Dr. Ventenilla reduced the dosage. (*Id*.) In February 2008, Schneider again reported anxiety and depression due to his brother's illness. (Tr. 163.) On examination, he showed no psychotic symptoms and his speech was slower and not disorganized. (*Id*.) Schneider was very anxious and depressed on April 2, 2008 due to his brother's physical condition. (Tr. 429.) On examination, Dr. Ventenilla noted logical and organized speech, good judgment, and no psychotic symptoms. (*Id*.) She provided supportive listening and continued his medication regimen. (*Id*.) Later that month, he was restless with a vacillating mood and fast speech. (Tr. 428.) Dr. Ventenilla continued him on his medications.

14

(*Id.*)

In May 2008, Schneider continued to be worried about his brother but showed no psychotic symptoms and no severe depression. (Tr. 427.) Examination revealed a neat appearance, broad affect, euthymic mood, and good insight and judgment. (*Id.*) In July 2008, Schneider reported feeling depressed but Dr. Ventenilla noted his affect was full and his mood was pleasant. (Tr. 458.) She continued him on his medications. (*Id.*) In August 2008, Schneider had run out of his medication and was extremely anxious. (Tr. 457.) Dr. Ventenilla increased his Klonopin dosage. (*Id.*) The following month, Schneider was "still hyper and talkative but to a lesser degree." (Tr. 456.) He reported no side effects from the Lamictal and Lyrica, and Dr. Ventenilla continued him on his medications. (*Id.*) In October 2008, Schneider remained hypomanic with "some somatic preoccupation," and exhibited a high level of anxiety. (Tr. 455.) Dr. Ventenilla again increased his Klonopin. (*Id.*)

In November 2008, Schneider was "somewhat anxious" but Dr. Ventenilla observed no psychotic symptoms and continued him on his medications. (Tr. 454.) In December 2008, Schneider expressed concern about his physical health problems and complained of sleep difficulties due to excessive worrying. (Tr. 453.) He reported no side effects and Dr. Ventenilla continued his medication regimen. (*Id.*)

On April 9, 2009 (five months after Schneider's DLI), Dr. Ventenilla completed another Medical Source Statement regarding Schneider's Mental Capacity. (Tr. 446-447.) Dr. Ventenilla found Schneider had a "fair" ability to understand, remember and carry out simple job instructions, maintain appearance, manage funds/schedules, and leave home on his own. (*Id.*) In all other categories listed on the form, however, she determined Schneider had "poor to no"

ability, including with respect to his abilities to follow work rules, use judgment, maintain attention and concentration for extended periods of two hour segments, maintain regular attendance and be punctual, deal with the public, relate to coworkers, interact with supervisors, deal with work stress, and complete a normal workday or workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id.*)  Dr. Ventenilla explained that "patient is still disorganized in thinking; easily distracted and easily overwhelmed even with minor changes."[6] (Tr. 447.)

**C.    Relevant State Agency Reports**

On July 5, 2005, Schneider underwent a consultative examination with clinical psychologist Richard N. Davis.  (Tr. 196-201.)  Schneider indicated he had received mental health treatment in the past "and is seeing someone now for anger and depression."  (Tr. 197.) He stated he had never tried to kill himself but had thought about it.  (*Id.*)  Schneider indicated he was "sometimes depressed and anxious."  (*Id.*)  He also stated he had had seven to nine different jobs in his life "and claims no trouble getting along with people in positions of authority nor with fellow workers."  (*Id.*)  Schneider's daily activities included dressing, bathing, shaving, washing the dishes, doing the laundry, cleaning, and doing the yard work.  (Tr. 199.) He claimed he had "no friends and has never had friends."  (*Id.*)

---

[6] The record reflects Dr. Ventenilla completed a third Medical Source Statement regarding Schneider's Mental Capacity in October 2009, well after his December 2008 DLI.  (Tr. 515-516.)  In this opinion, Dr. Ventenilla opined Schneider has a fair ability to maintain appearance, manage his funds/schedule, and leave home on his own; but poor to no ability in all other categories.  (*Id.*)  She stated Schneider "has been very forgetful due to racing thoughts" and "can't sustain attention to details related to work."  (*Id.*)

On mental status examination, Dr. Davis found Schneider was oriented to person, place and time and presented with an "average enough appearance." (Tr. 197, 199.) Schneider answered Dr. Davis' questions satisfactorily, was cooperative, and "presented with no eccentricities of manner on this date." (Tr. 197.) His flow of conversation and thought content was satisfactory, and no fragmentation or thoughts or flight of ideas was noted. (Tr. 198.) Schneider reported no sleep disturbances or crying spells. (*Id*.) He stated he "sometimes feels that he is worthless but this is decreasing." (*Id*.) Dr. Davis noted Schneider did not exhibit signs of anxiety during the examination but stated he is "fearful of having an anxiety attack and this fear is 'all the time.'" (*Id*.)

Dr. Davis found Schneider "presented with an appropriate enough affect on this date, however, seemed to be somewhat shy at times." (Tr. 199.) He concluded Schneider appeared to be capable of functioning within the average intellectual range. (*Id*.) Dr. Davis further found as follows:

> The individual presents as having little to no problems thinking logically, using common sense and judgment. He didn't indicate that he had problems getting along with fellow workers nor with supervisors when he is employed. He apparently has some personal and social adjustment problems, not being able to make friends and saying that his life seems to be his mother and his brother.

(Tr. 200.) Dr. Davis diagnosed adjustment disorder with anxiety and depression; dependent personality disorder; and avoidant personality disorder. (*Id*.) He assessed a Global Assessment of Functioning ("GAF") of 60, indicating moderate symptoms. (*Id*.) With regard to the four work-related mental abilities, Dr. Davis concluded Schneider (1) "did not indicate problems getting along with fellow workers and supervisors when he is employed;" (2) "is able to understand and follow simple and probably at least moderately difficult instructions;" and (3)

"has been able to perform at a moderately difficult task, working as a sales and service counter person for 3 years." (Tr. 201.)

On July 20, 2005, Schneider underwent a consultative examination with A.K. Bhaiji, M.D. (Tr. 215-217.) Schneider reported a history of depression and anxiety, as well as joint pain, spastic colon, and fibromyalgia. (Tr. 215.) He indicated "his biggest problem . . . is that he is somewhat depressed and is extremely tired in the morning." (*Id*.) On examination, it appears Dr. Bhaiji conducted range of motion testing; however, the parties do not direct the Court's attention to the specific results of this testing. (Tr. 216.) Dr. Bhaiji diagnosed fibromyalgia, depression, and irritable bowel syndrome ("IBS"). (Tr. 217.) He concluded as follows:

> Based on these findings, patient would not have difficulty with work-related physical activities such as sitting or standing. May have difficulty walking, lifting and carrying objects. No difficulty handling objects. No difficulty hearing. May have difficulty with speaking and traveling. I would recommend a psychiatric evaluation.

(Tr. 217.)

On July 20, 2005, state agency psychologist Todd E. Finnerty, Psy.D., reviewed Schneider's medical records and completed a Psychiatric Review Technique ("PRT"). (Tr. 202-214.) Dr. Finnerty found Schneider had mild limitations in his activities of daily living and social functioning; and no limitations in maintaining concentration, persistence, or pace. (Tr. 212.) He concluded Schneider's mental impairments were not severe. (Tr. 202.) On October 25, 2006, state agency psychologist Mel Zwissler, Ph.D., reviewed Schneider's medical records and affirmed Dr. Finnerty's Assessment. (Tr. 202.)

On October 3, 2007, state agency physician Katherine Lewis, Psy.D., reviewed Schneider's medical records and completed a PRT and Mental Residual Functional Capacity

("RFC") Assessment. (Tr. 382-399.) In the PRT, Dr. Lewis found Schneider was mildly limited in his activities of daily living; moderately limited in maintaining social functioning; and moderately limited in maintaining concentration, persistence, or pace. (Tr. 396.) In the Mental RFC Assessment, Dr. Lewis opined Schneider was moderately limited in his abilities to (1) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (2) accept instructions and respond appropriately to criticism from supervisors; and (3) respond appropriately to changes in the work setting. (Tr. 383.) In all other categories, Dr. Lewis found Schneider had either no evidence of limitation or no significant limitation. (Tr. 382-383.) She concluded Schneider "is able to understand and remember instructions, relate to others on a superficial basis and work at a job without strict time pressures or production quotas." (Tr. 385.)

On March 6, 2008, state agency physician Jennifer Swain, Psy.D. reviewed Schneider's medical records and completed a Case Analysis. (Tr. 420.) Dr. Swain affirmed Dr. Lewis' October 2007 Assessment. (*Id.*)

**D.     Hearing Testimony**

During the March 2, 2010 hearing, Schneider testified to the following:

- He lives in a one level, single family home with his brother. (Tr. 29-31.) He has never been married and has no children. (*Id.*) He has a twelfth grade education. (Tr. 30.) He has a drivers' license but no longer drives. (*Id.*)

- From 2000 to 2003, he worked part-time as a sales clerk. (Tr. 35-36.) In that job, he was on his feet "all day" and lifted up to 100 pounds. (*Id.*) He left that job because of left knee pain and because his doctor indicated he should not engage in repetitive, heavy lifting. (*Id.*) Prior to that, he worked in various jobs as a sales clerk and/or cashier. (Tr. 37-38.)

19

- He cannot work "because of the anxiety that I have to deal with all the time." (Tr. 38.) He has been diagnosed with bipolar disorder, type II. (*Id*.) At the present time, he is "relatively even." (*Id*.) He has had issues with his temper, and with depression. (Tr. 40, 45.) He feels anxious and overwhelmed when he is around large groups of people. (Tr. 43-44.) In his last job, he was anxious around crowds; however, it did not cause him to leave his duties or his job because his depression "acted like a damper" on his anxiety. (Tr. 44-45.) He also has trouble concentrating and is easily distracted. (Tr. 43-44.)

- He started seeing a psychiatrist in approximately 2004. (Tr. 46.) He takes Abilify and Klonopin. (Tr. 40-41.) He "started slowly improving" with medication, although his anti-depressant created problems with his temper. (Tr. 46.) He lost his temper at a customer on one occasion. (*Id*.) Since taking Abilify, he no longer has problems with his temper. (Tr. 40.)

- He also suffers from irritable bowel syndrome, acid reflux, lower back pain, and fibromyalgia. (Tr. 38-40.) He takes Lyrica and Nexium for these conditions. (*Id*.) He can lift and carry up to 20 pounds and has no problem sitting, bending, or climbing stairs. (Tr. 41-43.) He can only stand for 20 minutes before he must sit down, and his ability to walk varies. (Tr. 41.) He has difficulty kneeling. (Tr. 42.)

- His medications cause "a lot of dizziness." (Tr. 40-41.) He loses his balance several times a week. (*Id*.)

- He fixes meals for himself, washes the dishes, vacuums, sweeps the floor, takes out the trash, and does the laundry. (Tr. 31-32.) He does "some shopping" and can push the cart at the grocery store. (*Id.*) He can do some basic yard work but is not able to mow the lawn due to fatigue. (*Id*.) He has no problem taking care of his personal hygiene. (*Id.*)

- He watches television, reads and listens to music. (Tr. 33.) He does not travel and does not belong to any clubs or groups. (*Id.*) He spends most of the day inside his house with his brother. (Tr. 34-35.) He does not date, has no friends, and has no interest in socializing. (Tr. 48.)

The VE testified Schneider had past work as a cashier (light, SVP 2) and retail clerk (light, SVP 3). (Tr. 50.) The ALJ and Schneider's counsel then posed a series of hypothetical questions. (Tr. 50-55.) Of particular relevance herein, the ALJ asked the VE to consider the impact of "a person who due to various symptoms, they're either going to be late or absent from

work at least three times a month." (Tr. 53.) The VE testified that "would eliminate just about all jobs in the economy." (*Id.*) Counsel then asked the VE whether any work would be available for an individual that is off task 15 percent or more of the work shift. (Tr. 55.) The VE testified that "[i]f anyone is off task more than . . . . 15 percent on an ongoing basis, that would be more than most employers could tolerate." (*Id.*)

During the April 23, 2015 hearing, Schneider testified to the following:

- He lives with his two brothers. (Tr. 598.) He completed the 12th grade. (*Id.*) He has a drivers' license but has not driven in more than three years. (*Id.*) He cannot drive because his medications cause drowsiness and dizziness. (Tr. 605.)

- He was first diagnosed with depression in 1992, and was on anti-depressants for several years. (Tr. 610.) He started seeing a case manager and psychiatrist in 2003 due to anger issues, anxiety, and difficulty concentrating. (Tr. 603.) He experienced angry outbursts and could not control his emotions or temper. (Tr. 604.) He lost his temper at work on several occasions, and felt "really nervous" and "on edge." (Tr. 607.) He had trouble getting his work done due to his anxiety and nervousness. (Tr. 608.)

- In 2007, he was diagnosed with bipolar disorder type II and an anxiety disorder. (Tr. 610.) He was prescribed Lamictal, which "helped somewhat but not really that much and [he] didn't start getting better at all until 2009 when [his psychiatrist] put [him] on Abilify." (Tr. 611.) Since taking Abilify, his "mood is better" and he can do more than he did before. (Tr. 612-613.) Abilify does not, however, help with his anxiety or concentration. (Tr. 618-619.)

- On a typical day, he gets up, washes his face, brushes his teeth, and does some "little chores" around the house. (Tr. 601.) Sometimes he will go out to the store with his brother. (*Id.*) He washes dishes and does a "little cleaning" around the house. (Tr. 599.) He is lax when it comes to taking showers. (*Id.*) On average, he skips showering twice per week. (Tr. 599-600.)

- He watches old movies and TV shows with his brothers. (Tr. 600.) He cannot read for long periods of time because he loses his concentration. (*Id.*) He does not belong to any clubs, groups, or churches. (*Id.*) He has no friends and has never dated. (Tr. 600, 613.) He has never had a social life because he's too afraid that he will embarrass himself. (Tr. 613.) He does not like crowds or being in groups of people. (Tr. 614-615.)

- He was referred by his case manager to Vocational Guidance Services in 2007 or 2008. (Tr. 621-622.) It "didn't work out," however, because his brother was diagnosed with cancer in December 2007 and it was "a very bad time." (Tr. 622-623.)

The ALJ noted the previous VE had determined Schneider had past relevant work as a cashier and retail clerk and "just to try to keep things simple . . . we'll just assume that we had that right the first time." (Tr. 625.) The ALJ then posed the following hypothetical:

So then I would ask you to assume a hypothetical person of the same age, education, and employment background as Mr. Schneider who is lifting and carrying 20 pounds occasionally, 10 pounds frequently, who is also able to push and pull 10 pounds frequently, 20 pounds occasionally. This person is able to stand and walk for six hours, and sit for six. We'll say the person is occasionally climbing stairs and ramps, no ladders, ropes, and scaffolding. This person could occasionally balance and stoop, kneel, crouch, and crawl. This person is able to reach in all directions and can handle, finger, and feel. It [sic] performing simple, routine tasks with simple, short instructions, making simple decision, having few workplace changes. This person is not required to work in a fast paced production quota environment, meaning there should be no strict time pressures or production quotas. This person is having superficial interaction with – we'll say occasional and superficial interaction with co-workers, supervisors, and the public. And so superficial is going to refer to the intensity of the interaction, so there is no need for negotiations or confrontations. Would that hypothetical person be able to perform the work of a cashier or a retail clerk?

(Tr. 625-626.) The VE testified the hypothetical individual would not be able to perform Schneider's past work as a cashier and retail clerk, but would be able to perform other representative jobs in the economy, such as cleaner/housekeeper (light, unskilled, SVP 2); laundry folder (light, unskilled, SVP 2); and mail clerk in a non-postal setting (light, unskilled, SVP 2). (Tr. 627.)

The ALJ then asked the VE to consider the following:

Now the hypothetical person, let's say the hypothetical person is going to have difficulty maintaining a regular attendance. It's hard for them to get there, so sometimes they are going to be late, sometimes they are just going to

leave early, because they don't want to be there, and sometimes they are just
not going to show up at all. So at least three times per month this person
would be absent from work. Would that have an impact on any of the jobs
that you've mentioned?

(Tr. 627-628.) The VE testified "it would have an impact on all jobs that I mentioned" because

"three times per month would be excessive." (Tr. 628.)

Schneider's counsel then asked "if the hypothetical individual is going to be distracted,

or unfocused, or off task at least 20 percent of the time, and on occasion more, but 20 percent at

least, is that consistent with competitive employment?" (Tr. 629.) The VE testified 20 percent

off-task is "inconsistent with competitive work, and greater obviously more so." (*Id*.)

## III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

time of disability and must prove an inability to engage "in substantial gainful activity by reason

of any medically determinable physical or mental impairment," or combination of impairments,

that can be expected to "result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and

404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when

he became disabled; and (3) he filed while he was disabled or within twelve months of the date

the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way

of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v.*

*Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923

(6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in

"substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Schneider was insured on his alleged disability onset date, May 3, 2003 and remained insured through December 31, 2008, his date last insured ("DLI.")  (Tr. 573-574.)  Therefore, in order to be entitled to POD and DIB, Schneider must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2008.

2.    The claimant did not engage in substantial gainful activity during the period from his alleged onset date of May 3, 2003 through his date last insured of December 31, 2008 (20 CFR 404.1571 *et seq.*)

3.    Through the date last insured, the claimant had the following severe impairments: bipolar disorder, adjustment disorder with anxiety and depression, fibromyalgia, irritable bowel syndrome, obesity, and gastroesophageal reflux disease (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), meaning he could lift, carry, push and pull 20 pounds occasionally and up to 10 pounds maximum frequently.  He can sit, stand or walk for 6 hours in an 8-hour day. He can occasionally climb stairs or ramps, but never climb ladders, ropes, or scaffolds.  The claimant can occasionally balance, stoop, kneel, crouch or crawl.  The claimant can reach in all directions and handle, finger and feel. He can perform simple routine tasks with simple short instructions, make simple decisions, and have few workplace changes.  He is not required to work in a fast-paced production quota environment, meaning there should be no strict time pressures or production quotas. He can engage in occasional and superficial interaction with coworkers, supervisors, and the public.  Superficial refers to the intensity of the interaction, with no need for negotiation or confrontation.

6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on April ** 1959 and was 49 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not an issue in this case because the claimant's

past relevant work is unskilled (20 CFR 404.1568).

10.      Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.      The claimant was not under a disability, as defined in the Social Security Act, at any time from May 3, 2003, the alleged onset date, through December 31, 2008, the date last insured (20 CFR 404.1520(g)).

(Tr. 573-584.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner

are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely

overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

# VI. ANALYSIS

## *RFC*

In his sole assignment of error, Schneider argues "the ALJ upon remand failed to take into consideration all of Mr. Schneider's mental limitations, including medically related absenteeism and off task behavior and relations with co-workers, all resulting from this mental health impairments." (Doc. No. 12 at 12.) He maintains substantial evidence supports additional limitations which were not included in the RFC, including limitations that Schneider would be absent and/or tardy at least three times per month, off-task at least 15% of the workday, and would require minimal to no contact with the public and co-workers. (*Id*. at 13.)

The Commissioner argues the ALJ "reasonably evaluated Plaintiff's mental RFC, including providing pace-based restrictions consistent with the considerable weight she afforded to the State agency reviewing psychologists' opinions." (Doc. No. 14 at 10.) She maintains substantial evidence supports the ALJ's decision, including treatment records showing generally benign mental status examinations and improvement with medication, "fairly unremarkable" psychological consultative examinations, and Schneider's participation in vocational rehabilitation services in 2007 and 2008. In sum, the Commissioner argues Schneider has failed to demonstrate additional mental limitations relating to absenteeism, off-task behavior, and social interactions are warranted based on the record before the ALJ.

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R. § 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer v. Astrue*, 774 F.Supp.2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed.Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Here, the ALJ determined, at step two, that Schneider suffered from the severe

impairments of bipolar disorder, adjustment disorder with anxiety and depression, fibromyalgia, IBS, obesity, and gastroesophageal reflux disease. (Tr. 575.) After determining Schneider's impairments did not meet or equal a listing, the ALJ proceeded at step four to consider the medical and opinion evidence regarding his mental impairments. (Tr. 580-583.) The ALJ acknowledged Schneider's treatment for anxiety, depression, irritability and concentration deficits but noted Schneider reported significant improvement after treatment with medication and therapy. (Tr. 580.) The ALJ also noted the results of Schneider's vocational evaluations in 2007 and 2008, which found he was ready for competitive employment and had either adequate or outstanding scores with respect to personal characteristics, work behaviors, and learning aptitudes. (Tr. 580-581.)

With respect to the opinion evidence, the ALJ accorded "considerable weight" to Dr. Davis' "fairly unremarkable" consultative examination, finding it was "consistent with the evaluation and with treating mental health records, which show improvement, good insight, and no suicidal ideation." (Tr. 580.) He also accorded "considerable weight" to the opinions of state agency physicians Drs. Lewis and Swain "because they are consistent with and supported by the evidence including the claimant's wide range of daily activities." (Tr. 582.) In particular, the ALJ noted "the evidence supports the finding that claimant can remember instructions and relate superficially to others but would need less stress so no time pressure or quotas." (*Id.*)

The ALJ accorded "little weight" to Dr. Ventenilla's August 2007, April 2009, and October 2009 opinions "because they are not supported by her own progress notes or by the claimant's wide range of daily activities." (Tr. 582.) In particular, the ALJ noted "Dr. Ventenilla generally reported the claimant's condition as stable in treatment notes" and

"[c]laimant's thoughts are noted to be organized and logical, he is always neat, his affect is broad and mood euthymic." (*Id.*) Finally, the ALJ accorded (1) "some weight" to Dr. Ahmed's September 2006 opinion "because it is consistent with and supported by the weight of the evidence and by claimant's wide range of daily activities," and (2) "limited weight" to Ms. Finn's statements due to some inconsistencies in her reports. (Tr. 581-582.)

The ALJ formulated the following mental limitations in the RFC:

> He can perform simple routine tasks with simple short instructions, make simple decisions, and have few workplace changes. He is not required to work in a fast-paced production quota environment, meaning there should be no strict time pressures or production quotas. He can engage in occasional and superficial interaction with coworkers, supervisors, and the public. Superficial refers to the intensity of the interaction, with no need for negotiation or confrontation.

(Tr. 578.)

The Court finds substantial evidence supports the mental limitations set forth in the ALJ's RFC determination. During the majority of the period at issue (i.e., from May 2003 through December 2008), Schneider reported significant improvement with medication and therapy. As the ALJ observed, in June 2004, Schneider reported "feeling a lot better" with "80 - 90% improvement" since taking Remeron. (Tr. 271.) In July 2004, he stated "my mental health is getting better and better" and "I don't have the irritability anymore." (Tr. 269.) In January and February 2005, Schneider was "doing very well" and denied feeling depressed. (Tr. 261, 262.) In August 2005, he was feeling "very well mentally" with no depression or irritability. (Tr. 256.) In April 2006, Schneider was "doing very well," denied any problems, and stated "this is the best I have done over the last 25 years." ( Tr. 241.) In July 2006, Schneider reaffirmed that "I seem to be doing very well mentally and emotionally." (Tr. 237.) Several months later, in December

2006, Schneider reported increased energy and stamina.  (Tr. 370.)  In May 2007, Schneider reported "feeling much better" since taking Lamictal and endorsed improvement in his temper, mood, and sleep.  (Tr. 365.)  In September 2007, he reported he was "completely off the Remeron and has no return of depression or much racing thoughts."  (Tr. 167.)  In November 2007, Schneider advised his gastroenterologist that his medications were "controlling his psychiatric symptoms well."  (Tr. 439.)

In addition, mental status examination findings throughout this time period were largely normal.  Between 2004 and 2006, Dr. Ahmed consistently found Schneider was alert and oriented with good eye contact and rapport; pleasant, polite and cooperative behavior; normal speech; euthymic mood; mildly anxious or appropriate affect; no auditory or visual hallucinations or delusions; goal directed; and good insight and judgment.  (Tr. 271, 270, 269, 268, 267, 266, 265, 264, 263, 262, 261, 260, 259, 258, 256-257, 254, 251, 249, 247, 245, 243, 241-242, 238, 237, 374, 372, 370.)  Further, while Dr. Ventenilla sometimes noted hypomanic behavior and anxiety in her 2007 treatment records, she frequently documented full affect, pleasant or euthymic mood, good insight and judgment, normal speech, and no psychotic symptoms.  (Tr. 369, 365, 362, 167, 165.)

Moreover, as the ALJ correctly noted, Schneider underwent vocational evaluations in May through July 2007 and November through December 2007.  (Tr. 324-344, 406-411.)   In the first evaluation, he was found to be "ready for competitive employment" with excellent work behaviors and functional skills.  (Tr. 340-341.)  In the second evaluation, he was rated as "outstanding" in the categories of attendance, punctuality, on-task behavior, accepting authority, interaction with staff and peers, and cooperation.  (Tr. 408-409.)

The above evidence of Schneider's improvement with treatment, largely normal examination findings, and successful vocational training provides substantial evidence in support of the mental limitations set forth in the ALJ's RFC determination. Moreover, as the Commissioner correctly notes, the RFC is supported by the opinions of state agency physicians Drs. Lewis and Swain, both of whom concluded Schneider "is able to understand and remember instructions, relate to others on a superficial basis and work at a job without strict time pressures or production quotas."[7] (Tr. 385, 420.) The ALJ's RFC is also supported by the opinion of consultative examiner Dr. Davis, who concluded Schneider (1) "did not indicate problems getting along with fellow workers and supervisors when he is employed;" and (2) "is able to understand and follow simple and probably at least moderately difficult instructions." (Tr. 201.)

The Court recognizes Schneider experienced an increase in symptoms in 2008, caused by his brother's cancer diagnosis, his mother's declining health, and a death in the family. The ALJ acknowledged this evidence and addressed it as follows:

> Claimant was depressed in January 2008 due to a death in the family (Exhibit 13E/4). There were further problems in February 2008 because his brother's cancer came back. Claimant showed an anxious affect and depressed mood, but no suicidal ideation in February 2008 (Exhibit 13E/3). These records show claimant's mental condition was generally stable, except for some temporary exacerbation due to stressor's such as relative's illness.

(Tr. 580.)

---

[7] The Court notes the ALJ expressly addressed the specific issue identified in Magistrate Judge Baughman's February 2013 Opinion as requiring remand for further consideration. In that Opinion, Judge Baughman remanded because the ALJ accorded Dr. Lewis' opinion great weight but failed to include Dr. Lewis' pace-based limitations in either the hypothetical or the RFC. *See Schneider v. Comm'r of Soc. Sec.*, Case No. 1:11cv2017 (N.D. Ohio) (Doc. No. 29 at 5-6.) On remand, the ALJ again accorded considerable weight to Dr. Lewis' opinion but this time expressly included Dr. Lewis' pace-based restrictions in both the hypothetical and RFC. (Tr. 578, 582, 625-626.)

The ALJ's assessment is supported by substantial evidence. As noted above, the record reflects Schneider showed consistent improvement with treatment until his brother (to whom he was very close) was diagnosed with cancer in January 2008. (Tr. 164.) Schneider reported increased anxiety and depression throughout much of 2008 as a result of his brother's cancer. Treatment records reflect Dr. Ventenilla adjusted Schneider's medications, adding Klonopin and increasing the dosage of that medication on several occasions. (Tr. 164, 457, 455.) Thereafter, Dr. Ventenilla noted no psychotic symptoms and some improvement in Schneider's condition. (Tr. 163, 429, 427, 458.) For example, in May 2008, examination revealed a neat appearance, broad affect, euthymic mood, and good insight and judgment. (Tr. 427.) In July 2008, Schneider reported feeling depressed but Dr. Ventenilla noted his affect was full and his mood was pleasant. (Tr. 458.) In November 2008, Schneider was "somewhat anxious" but Dr. Ventenilla observed no psychotic symptoms and continued him on his medications. (Tr. 454.) In light of the above, substantial evidence supports the ALJ's conclusion that the increase in Schneider's symptoms was situational in nature and he remained generally stable with medication and treatment during this time period.

Finally, the Court rejects Schneider's argument the RFC is not supported by substantial evidence in light of Dr. Ventenilla's opinions that Schneider had poor to no ability with making occupational adjustments, intellectual functioning, and making personal and social adjustments. The ALJ accorded "little weight" to Dr. Ventenilla's opinions on the grounds they were unsupported by her own progress notes or by Schneider's "wide range of daily activities." (Tr. 582.) Schneider does not argue, in the instant appeal, that the ALJ failed to give good reasons

for rejecting Dr. Ventenilla's opinions.[8]  As noted *supra*, the mental RFC assessed by the ALJ is supported by the opinions of Drs. Lewis, Swain, and Davis, as well as the medical evidence of Schneider's improvement with treatment and largely normal mental status examination findings.

In light of the above, the Court finds Schneider has failed to demonstrate additional limitations relating to absenteeism, off-task behavior, and social interactions were warranted. While there is some evidence Schneider reported difficulties with punctuality, sustaining concentration, and social interaction, substantial evidence supports the mental limitations set forth in the RFC.  As noted above, Schneider's first vocational assessment showed he was "on time and present each day," "able to follow all directions without additional explanation," and "cooperative and interacted appropriately with staff and peers."  (Tr. 329, 339.)  During his second vocational assessment, he was rated as "outstanding" in the categories of attendance, punctuality, on-task behavior, and interaction with staff and peers.  (Tr. 408-409.)  Additionally, Dr. Davis concluded Schneider (1) "did not indicate problems getting along with fellow workers and supervisors when is employed," and (2) "is able to understand and follow simple and probably at least moderately difficult instructions."  (Tr. 201.)  Drs. Lewis and Swain both concluded Schneider is able to understand and remember instructions, relate to others on a superficial basis, and work at a job without strict time pressures.  (Tr. 385, 420.)  The ALJ fully

_____

[8] Schneider did raise this argument in his previous appeal to this Court; however, Magistrate Judge Baughman expressly rejected this argument, finding Dr. Ventenilla's "evaluations opine extreme limitations, which would give Schneider the capability for practically nothing" and "are not consistent with progress notes showing Schneider stable with medication and with a work retraining experience in 2007 in which Schneider performed relatively well." *Schneider v. Comm'r of Soc. Sec.*, Case No. 1:11CV2017 (N.D. Ohio) (Doc. No. 29 at 4) (footnotes omitted).  Here, the ALJ provides similar reasons for rejecting Dr. Ventenilla's opinions and Schneider does not assert the ALJ violated the treating physician rule in so doing.

accounted for Schneider's mental limitations by restricting him to simple routine tasks with simple short instructions and simple decisions, few workplace changes, no strict-time pressures or production quotas, and occasional and superficial interaction with coworkers, supervisors, and the public.

Accordingly, and for all the reasons set forth above, the Court finds the mental limitations set forth in the RFC are supported by substantial evidence. Schneider's sole assignment of error is without merit.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

*s/Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: August 16, 2017

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**